**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

DATASPHERE, INC.,

                  Plaintiff,

      v.

COMPUTER HORIZONS CORP.,

           Defendant/Third-Party Plaintiff.
_____

COMPUTER HORIZONS CORP.,

           Defendant/Third-Party Plaintiff,

      v.

ROBERT DOYLE, individually, and
R. DOYLE, INC.,

           Third-Party Defendants.
_____

:
:
:
:    Hon. Stanley R. Chesler, U.S.D.J.
:    Civil Action No. 05-2717 (SRC)
:
:
:    **OPINION**
:
:
:
:
:
:
:
:
:
:
:
:
:
:

**CHESLER, U.S.D.J.**

## INTRODUCTION

Plaintiff Datasphere, Inc. ("Datasphere") brings this action for breach of contract against

Defendant Computer Horizons Corp. ("CHC").  Plaintiff contends that the parties entered into a

contract and that CHC breached two provisions in the contract, the restrictive hiring covenant

and the right of first refusal.  Defendant has filed a counterclaim asserting aiding and abetting a

breach of fiduciary duty, as well as third-party claims against Robert Doyle ("Doyle") and Robert

Doyle, Inc. ("RDI") which assert breach of fiduciary duty.  A bench trial was held on March 23, 24, and 25, 2009.  Upon hearing the evidence presented at trial, this Court finds no party has established any liability of any other party on any claim, counterclaim, or third-party claim at issue, and Judgment will be entered accordingly.

## BACKGROUND

This case arises out of a set of contract disputes between two providers of computer services, CHC and Datasphere.  In 2002 and 2003, the two companies entered into two agreements regarding working together to provide services to customers, one of which was AT&T.  One of these agreements, the Marketing Representative Agreement, has been declared void by this Court.  The other agreement, the AT&T Agreement (the "Agreement"), is the subject of this trial.  On February 4, 2003, Imran ("Ron") Merchant, on behalf of Datasphere, and Dayananda Kamath, on behalf of CHC, executed the Agreement.

On May 2, 2005, Plaintiff filed a ten-count Complaint in the Superior Court of New Jersey, Morris County: Law Division.  On May 26, 2005, Defendant removed the pending action to this Court.  In answering, CHC filed a counterclaim and a third-party complaint against third-party Defendants Robert Doyle and R. Doyle, Inc.

In 2007, the parties filed a motion and cross-motion for summary judgment.  On June 4, 2008, this Court entered its decision on these motions, resolving in their entirety all counts in the Complaint except for the Second and Sixth Count.  As to the Second Count, the motion for summary judgment was denied.  As to the Sixth Count, CHC's motion for summary judgment was granted in part (as to the Marketing Representative Agreement) and denied in part (as to the right of first refusal and restrictive covenant provisions in the AT&T Agreement).

2

On August 19, 2008, CHC moved for summary judgment on the Second and Sixth Counts. On October 9, 2008, this Court entered summary judgment on the Second Count and on every part of the Sixth Count, with the exception of the claims for the breach of the restrictive hiring covenant and the right of first refusal, which were found to be matters for trial.

## STIPULATED FACTS

The Final Pretrial Order ("FPO") states the following as stipulated facts:

1.     "In or about late January 2002, Datasphere was formed by Robert Doyle ("Doyle"), Vinod Agiwal, Imran (Ron) Merchant, and Robert Dodge. . . Each principal held a 25% ownership interest, including Doyle . . . In March 2003, Doyle acquired the shares of Agiwal and Dodge in Datasphere, and became the sole director and majority shareholder."  (FPO 3.)

2.     "Doyle managed the Datasphere team and communicated with the other principals by email using his CHC email account."  (FPO 3.)

3.     "On February 4, 2003, CHC and Datasphere entered into an agreement concerning CHC's long-term client, AT&T, which was executed by Dayananda Kamath and Imran Merchant respectively on behalf of CHC and Datasphere."  (FPO 4.)

4.     "Effective April 1, 2003, two (2) Datasphere independent contractors, Tathagata Ghosh and Wayne Johnson, became CHC employees and worked on the AT&T project.  Prior to that time, Ghosh and Johnson worked on the AT&T project as independent contractors of Datasphere."  (FPO 5.)

## THE EVIDENCE AT TRIAL

### A.     Testimony of Robert Doyle

Mr. Doyle stated that, at present, he owned 100% of Datasphere.  (3/23/2009 Tr. 7:8.)  He has owned 100% of RDI since its creation.  (Id. at 8:14.)  Pursuant to a written agreement, RDI provided computer consulting services to CHC from December of 1999 to March of 2003.  (Id. at 9:5-10:17.)  CHC had given Mr. Doyle the title of Vice President.  (Id. at 21:25.)  In his capacity as a Vice President of CHC, Mr. Doyle had signed the MRA Agreement.  (Id. at 34:9-14.)  Mr.

3

Doyle also signed other software licensing or partnership agreements on behalf of CHC in this capacity.  (Id. at 34:18-20.)  During the period from February, 2002 through March, 2003, CHC paid RDI at least $250,000 as compensation for Mr. Doyle's services.  (Id. at 51:1-12.)

While working for CHC, Mr. Doyle suggested to some consultants that they form a company to provide data cleansing services.  (Id. at 37:11-15.)  At the time of the formation of Datasphere, Mr. Doyle told the other shareholders that CHC would use Datasphere exclusively for future data cleansing engagements.  (Id. at 44:3-9.)

Mr. Doyle was not involved in the negotiation of the AT&T Agreement.  (Id. at 22:15.) Ron Merchant negotiated the Agreement on behalf of Datasphere and Daya Kamath, George Brucia, and Joe Cassase negotiated it on behalf of CHC.  (Id. at 22:16-20.)

Mr. Doyle owned 25% of the shares of Datasphere when the corporation was first formed. (Id. at 27:21.)  At some point, Mr. Doyle placed his shares into a "constructive trust" with his then-wife, Maryann Doyle, as trustee.  (Id. at 27:24-28:5; 44:13-16.)  No documents were ever generated showing the creation of that trust.  (Id. at 44:17-20.)  Nor did Mrs. Doyle sign any documents when she became trustee.  (Id. at 45:9-14.)  Mr. Doyle established the trust arrangement so that he could control the shares in Datasphere "while it looked to an outsider as all above board."  (Id. at 45:15-18.)  During the time that the shares were held in this trust, Mr. Doyle continued to vote them.  (Id. at 45:19-22.)

> Q:   And isn't it also correct that no one at CHC knew that you had this 25 percent interest that Maryann was holding for you in Datasphere?
>
> A:    Correct.

(Id. at 46:6-9.)  After Mr. Doyle was terminated from CHC in March of 2003, he caused the

shares that he had placed in the constructive trust to be returned to him by declaring "they're mine."  (Id. at 47:18-48:4.)

Mr. Doyle acquired the remaining shares in Datasphere after he "left CHC," in March or April of 2003, when Datasphere was no longer operating.  (Id. at 28:17-20.)  By April of 2003, he owned 100% of Datasphere.  (Id. at 54:18-21.)

At 5:02 p.m. on March 3, 2003, Mr. Doyle sent an email to a number of CHC employees stating, inter alia, "FYI, I will not be joining Datasphere."  (Id. at 61:14-62:6.)  When he sent that email, Mr. Doyle was a 75% owner, as well as a director, Chairman, CEO, and President of Datasphere.  (Id. at 62:7-10.)

**B.      Testimony of Charles Lunden**

Mr. Lunden analyzed damages to Datasphere stemming from the claimed breaches of the AT&T Agreement.  (Id. at 77:11-16; 78:2-5.)  As to the right of first refusal, had Datasphere gotten the benefit of the opportunity to provide data management services under the AT&T Agreement, it would have earned profits of approximately $1.4 million.  (Id. at 77:11-19.)  This figure was based on the assumption that Datasphere would have arranged for 50 employees to provide services for a two-year period.  (Id. at 78:6-25.)  These figures came from Mr. Kamath's deposition testimony that the AT&T project lasted two years and involved 50 consultants.  (Id. at 79:7-25.)  Mr. Lunden assumed that all 50 consultants worked on data management.  (Id. at 91:8-10.)

On cross-examination, Mr. Lunden stated that the AT&T project was divided into two phases, and that the damages at issue related to only the second phase.  (Id. at 92:22-93:5.)  Mr. Lunden conceded that the length of phase two would be important to the calculation of damages.

(Id. at 94:1-20.)  Mr. Lunden only knew that phase two continued into December of 2003, but not when it started or ended.  (Id. at 94:8-14.)  Mr. Lunden conceded that, if phase two did not actually involve fifty employees working for 24 months, that would make a "very material difference."  (Id. at 95:9-12.)  Mr. Lunden further conceded that, if some of the fifty employees worked on the project but did not perform data management services, that would further affect the damages estimate.  (Id. at 98:5-19.)  When asked whether he did any investigation of whether the fifty employees did data management or something else, Mr. Lunden stated: "I looked for references in the deposition and couldn't find any either way."  (Id. at 98:25-99:1.)

Mr. Lunden estimated the damages to Datasphere stemming from CHC's hiring of Ghosh and Johnson as $90,240.00.  (Id. at 80:24-81:9.)  This estimate was based in part on his estimate of total damages and on the assumption that Datasphere would have arranged for 50 employees to provide services for a two-year period.  (Id. at 81:10-19.)  Mr. Lunden stated that the two estimates of damages were overlapping and not additive, and that it would be "inappropriate" and "double dipping" to make awards for both.  (Id. at 101:12-21.)

Mr. Lunden relied in part on pricing information from the DCA workbook, including an approval sheet.  (Id. at 110:1-17.)  The approval sheet was unsigned and referred to a project with a start date of August 26, 2002.  (Id. at 110:18-111:4.)  Thus, the approval sheet referred to a project with a start date six months before the date that the AT&T Agreement was signed.  (Id. at 111:25-112:3.)

Mr. Lunden based his estimates on the assumption that consultants would be paid $50 per hour, and derived this assumption from finding that one consultant had been paid $50 per hour.  (Id. at 123:21-25.)  When asked to consider the actual rate which AT&T paid CHC for

6

consultants, and the need for both CHC and Datasphere to make a reasonable profit, Mr. Lunden stated that the pay rate would need to be between $38 and $40 per hour.  (Id. at 121:1-122:5.)

Mr. Lunden had originally estimated Datasphere's marginal costs at 5% and stated that he had based this figure on a conversation he had with Mr. Doyle.  (Id. at 126:19-23.)  He conceded that he had stated this figure at his deposition but did not have the conversation with Mr. Doyle until after the deposition.  (Id. at 127:2-15.)

Mr. Lunden never considered whether Datasphere had the ability to finance the business that providing the data management staffing for the AT&T project would have entailed.  (Id. at 128:19-23.)  He assumed that the contractors would wait for their pay until CHC paid Datasphere.  (Id. at 133:6-7.)  He did not know how long it took AT&T to pay CHC.  (Id. at 137:1-3.)

### C.    Testimony of Vinod Agiwal

Mr. Agiwal stated that he had been technical director and treasurer of Datasphere, and had been a 25% shareholder from the time of the corporation's formation.  (Id. at 139:11-23; 141:19.)  Datasphere worked only on CHC projects.  (Id. at 146:7-10.)  Bob Doyle negotiated the AT&T Agreement on behalf of CHC.  (Id. at 151:14-16.)

### D.    Testimony of Stephen Gonosey

Mr. Gonosey stated that he had been employed by CHC from September, 2000 through September, 2002, first as a project manager and then as Vice President of sales.  (3/24/2009 Tr. 8:16-9:4.)  He reported to Randy Verdino.  (Id. at 9:6.)  While Mr. Gonosey was a CHC Vice President, he was aware that Robert Doyle was a principal in Datasphere.  (Id. at 10:13-16.)  Mr. Gonosey had more than one conversation with Randy Verdino in which they discussed that

Robert Doyle "had formed a group called Datasphere."  (Id. at 11:14-24.)

### E.    Testimony of Dayananda Kamath

Mr. Kamath stated that he had been an engagement manager for CHC between 2001 and 2005, and served as engagement manager for the second phase of the AT&T project.  (Id. at 18:3-13; 19:1-22.)  He did not know the exact number of consultants that CHC had supplied to AT&T during the project, nor did he know how long Phase II ran.  (Id. at 22:20-23:12.)  He did not know the exact timing of Datasphere's involvement with Phase II.  (Id. at 20:15-20.)  Viewing his deposition testimony refreshed his recollection that Phase II was "around two plus years" long.  (Id. at 24:3-8.)  Mr. Kamath had signed the AT&T Agreement on behalf of CHC.  (Id. at 24:22-25.)  He was not involved in negotiating the agreement and did not know who was.  (Id. at 26:1-4; 27:9-13.)

Phase II began in 2003.  (Id. at 30:13-15.)  Some portion of the consultants provided by CHC to AT&T in 2003 did not perform data management services.  (Id. at 31:22-25.)  More than 50% of the work for AT&T was not related to data management.  (Id. at 32:23-25.)

When later recalled to the stand, Mr. Kamath stated that, while Phase II began at "around the same time" that the Agreement was executed, he did not know the exact sequence of events.  (Id. at 101:13-17.)  He did not recall the exact dates.  (Id. at 111:8-9.)

### F.    Testimony of Tathagata Ghosh

Mr. Ghosh stated that he had worked for Datasphere, providing consulting services to CHC on the AT&T project, beginning in September of 2002.  (Id. at 21:3-8.)

### G.    Testimony of Lawrence Frankel

Mr. Frankel reviewed Mr. Lunden's expert report.  (Id. at 134:24)  Datasphere did not

have the financial resources to have financially supported and sustained 50 consultants for two years, as assumed in the expert report.  (Id. at 136:4-8.)  Nor did Datasphere have the creditworthiness to have borrowed the necessary capital.  (Id. at 138:10-15.)  The master consulting agreement specified payment terms of net 60 days, which would have required Datasphere to accumulate expenses of $542,000, which it could not finance.  (Id. at 154:20-155:5.)

### H.   Testimony of Randall Joseph Verdino

Mr. Verdino stated that he had been employed by CHC from October 1, 1986 through February 16, 2007.  (3/25/2009 Tr. 10:23.)  He never had any conversations with Steve Gonosey about whether Robert Doyle was a principal of Datasphere.  (Id. at 15:4-6.)  Until Mr. Verdino learned that Doyle sued CHC, Mr. Verdino did not know that Doyle was a principal of Datasphere.  (Id. at 15:13-16:17.)  Doyle had previously brought Datasphere to Mr. Verdino's attention.  (Id. at 14:12-14.)  Mr. Verdino stated that, at the time that Doyle brought Datasphere to Mr. Verdino's attention:

> Bob assured me and I think the rest of the team that he has, you know, this company that he has a, you know, he has a connection to and at the time he informed me that the owner of Datasphere was his wife's brother, guy named Bob Dodge, so I thought he was referring the business over to somebody he knew.

(Id. at 14:20-15:1.)

### I.   Deposition Testimony of Imran Merchant

Selected testimony from the January 18, 2007 deposition of Imran Merchant was read into the trial record.  (3/24/2009 Tr. 48:18-57:9.)  Mr. Merchant was one of the four original principals of Datasphere and participated in conversations about its formation.  (1/18/2007 Dep.

Tr. 19:10-20:7.)  The principals discussed that "the fact that [Doyle] gave 25 percent to Maryann Doyle was because he didn't want Computer Horizons to know that he was going to be a principal within Datasphere, Inc."  (Id. at 25:8-19.)

## DISCUSSION

### A.    **Plaintiff's Claims**

This Court conducted a bench trial on the Sixth Count of the Complaint, for breach of contract.  Plaintiff asserts that Defendant breached the provisions of the AT&T Agreement concerning the restrictive hiring covenant and the right of first refusal.  As stipulated in the Final Pretrial Order, the relevant provisions of the Agreement state:

> (b)    CHC will provide AT&T the first right of refusal, for all supplemental staffing requirements at AT&T for Data Management Services. . .

> (g)    CHC and Datasphere will not solicit or endeavor to entice away from or discourage from being employed by the other party, any person who is an employee of the other party during a 36-month period commencing on the effective agreement date.  CHC and Datasphere may waive this restriction on a case-by-case basis, if there is mutual consent.

(FPO 4.)

The Agreement provides that it "is subject to and will be construed within the laws of the State of Ohio."  (Pl.'s Ex. 15 at 2.)  Nonetheless, Plaintiff contends that its breach of contract claim should be decided under New Jersey law.  (Pl.'s Post-Trial Br. 13.)  In reply, Defendant does not contest this but, rather, contends that the choice of which state's law should govern the breach of contract claim is immaterial.  (Def.'s Post-Trial Reply 14.)

Neither party asserts that the choice of law is material to deciding the breach of contract claim.  This Court finds that the parties have waived the application of the Agreement's

governing law provision, and have waived their right to object to the application of New Jersey

law to decide the breach of contract claim.  The breach of contract claim will be decided under

the law of New Jersey.

Under New Jersey law, "[t]o establish a breach of contract claim, a plaintiff has the

burden to show that the parties entered into a valid contract, that the defendant failed to perform

his obligations under the contract and that the plaintiff sustained damages as a result."  Murphy

v. Implicito, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007).  Plaintiff contends that lost

profits should be the measure of damages.  (FPO 9.)  Defendant does not dispute this point.

(Def.'s Post-Trial Br. 24.)  New Jersey law requires a "reasonably accurate and fair basis for the

computation of alleged lost profits."  V.A.L. Floors, Inc. v. Westminster Communities, Inc., 355

N.J. Super. 416, 424 (N.J. Super. Ct. App. Div. 2002).

Having heard all the evidence offered at trial, this Court concludes that Plaintiff has failed

to meet its burden to show that damages were sustained as a result of the breach.  Plaintiff has

not shown, by a preponderance of the evidence, a reasonably accurate and fair basis for the

calculation of lost profits.

In its post-trial brief, Plaintiff argues that its burden of proof of damages is "tempered and

lowered" because CHC has made it more difficult to quantify the damages.  (Pl.'s Post-Trial Br.

14-15.)  Plaintiff cites no New Jersey cases to support its position that New Jersey courts have

the discretion to employ a standard other than the "reasonably accurate" standard cited above.

During the trial, CHC moved to strike the testimony of Datasphere's expert, Charles

Lunden.  The Court need not reach this motion because this Court concludes that, having heard

Mr. Lunden's testimony and considered its substance, the expert testimony will be given no

11

weight.  Cross-examination devastated the validity of Mr. Lunden's estimate of damages by showing that many of his underlying assumptions were erroneous or based on inadequate evidence.

First, Mr. Lunden conceded that the AT&T project was divided into two phases, and that the damages at issue in this case involved only the second phase, but he did not know the actual length of the second phase, and had no evidence to support his assumption that it was 24 months long.  In considering Mr. Lunden's estimate, then, the most basic question is whether his assumption of a two-year damages period was reasonably accurate.  The evidence presented at trial does not permit this question to be answered in the affirmative.  No witness stated clearly when Phase two ended.[1]  Datasphere did not establish the length of the period covered by the Agreement, for which damages were sought.[2]  Because of this, this Court has no basis to accept Mr. Lunden's two-year estimate as reasonably accurate.[3]  This alone shows that his damages

---

[1] Datasphere contends that Mr. Lunden relied on the information provided by Mr. Kamath.  Mr. Kamath testified repeatedly that he could not recollect the exact dates of Phase II.

[2] Plaintiff's post-trial reply brief in effect concedes this point when it tries to rebut "CHC's challenge that Lunden did not know exactly how long Phase II lasted, when CHC provided no records to establish this fact and, as a result, Lunden relied upon the best evidence available – to wit: Kamath's sworn testimony that Phase II lasted over two (2) years."  This imprecise testimony does not, however, establish the length of the damages period.  Datasphere contends that the contractual phrase "supplemental staffing" referred to "all future placements on the AT&T project, since the Phase II was already underway and staffing had begun."  (Pl.'s Post-Trial Br. ¶ 42(f).)  Thus, Datasphere concedes that the damages period was of a shorter duration than Phase II.  Mr. Kamath's imprecise testimony about the duration of Phase II did not give Mr. Lunden a sufficiently accurate basis to estimate the duration of the damages period.

[3] Datasphere's post-trial arguments on this point are telling: 1) CHC refused to disclose the information needed to establish start and end dates; and 2) "the actual beginning and ending dates are irrelevant" because Lunden's estimate was "conservative."  (Pl.'s Post-Trial Br. 17.)  The Court notes that Datasphere does not argue that Mr. Lunden's estimate of the duration of the damages period was accurate.  This Court rejects the argument that it should give credence to the

estimate is unacceptably speculative, but there are more problems.

Second, Mr. Lunden conceded that the contract provision at issue covered only "data management services," but he did not know what this meant and had not found out.  He believed that the figures on which he based his estimate involved only data management services, but he did not know if this was correct, and he conceded that, if some of those employees performed other kinds of work, that would have affected his estimate.  Third, he relied on pricing information from a document that referred to a project with a start date that was six months prior to the signing of the AT&T Agreement.  Fourth, he had not considered the question of whether Datasphere had the resources to finance the business he estimated it would have had.  He assumed, without evidence in support, that the contractors would have worked and waited for their pay until CHC paid Datasphere.  Fifth, his original estimate of 5% for marginal costs was based on no evidence whatever; while he claimed to have derived this figure from a conversation with Mr. Doyle, he admitted that this conversation only occurred <u>after</u> he stated the estimate at his deposition.

Mr. Lunden's estimate of the rate at which Datasphere would have paid the consultants is also seriously problematic.  Mr. Lunden estimated that CHC would have paid Datasphere $65 per hour, and that Datasphere would have paid the consultants $50.  Yet Mr. Lunden conceded that the average project billing rate AT&T paid CHC during the project at issue was $61, that CHC would have needed to have made a profit, that Datasphere would have needed to make a profit, and that, therefore, when one considered all these factors, Datasphere would have needed

expert's inaccurate estimate because of CHC's alleged refusal to make disclosures.  As to the argument that the estimate of two years was a conservative one, the evidence of record does not allow any inference as to whether two years was too large, too small, or just right.

contractors who would work for $38 to $40 per hour.  He did not know whether any such

workers were available in the workforce.  The only evidence that he had for the consultant pay

rate he used in his estimate was the report of one consultant that he was paid $50 per hour.

Again, this shows that Mr. Lunden's estimate of damages deserves no weight.

 In addition, Datasphere makes an argument in its post-trial brief that, at the least, supports

this Court's decision to give Mr. Lunden's testimony no weight.  Datasphere argues, in short,

that, had Mr. Lunden been aware of the information in Exhibit D-18, he would have calculated

lost profits of $728,915.  (Pl.'s Post-Trial Br. 19.)  This offer of an alternative damages amount –

cutting roughly in half the estimate Mr. Lunden stated at trial – appears to be a concession that

Mr. Lunden's estimate may not be based on accurate information.  This supports this Court's

decision not to rely on it.

 Moreover, CHC's expert, Mr. Frankel, countered Mr. Lunden's testimony with the

critique that Datasphere lacked the financial resources to fund the amount of business that it

estimated it had lost due to the breach of the right of first refusal.  Datasphere does not contend

that it did have sufficient resources.  Rather, Mr. Lunden relied on the assumption that, had

Datasphere been unable to make payroll for its average of fifty employees, all fifty would have

kept working despite being unpaid.  Datasphere has presented no evidence to justify this

questionable assumption, and this demonstrates another serious problem with the assumptions

underlying Mr. Lunden's estimate.

 As discussed above, New Jersey law requires that the computation of lost profits be

reasonably accurate.  Datasphere has attempted to calculate the lost profits using a reasonable

method which relies on estimates of the number of man-hours of data management services

14

covered by the contract, the payment CHC would have made for those services, and the overhead and staff costs of providing those services for Datasphere. Datasphere has failed to offer evidence that allows reasonably accurate estimates of most of these underlying data points. There was no testimony which allowed the number of man-hours to be estimated with reasonable accuracy. No evidence shows more than a vague guess at how many consultants worked for what period of time. As discussed, no witness had anything but vague knowledge of when Phase II ended.

Furthermore, Datasphere's own witness, Kamath, testified that more than 50% of the work for AT&T was not related to data management, but he could not specify more precisely than that. This Court credits this testimony and finds that it alone devastates Plaintiff's position on damages. The contract covers only data management services, and Mr. Lunden conceded that, if some of the workers did not perform data management services, it would affect his estimate. The evidence does not allow the Court to compute the number of man-hours of data management services covered by the contract with reasonable accuracy. As such, the Court lacks a reasonably accurate basis to determine lost profits for the breach of the right of first refusal.

Nor did Datasphere establish a reasonably accurate basis to compute the lost profits due to the breach of the restrictive hiring provision. To prove these damages, Datasphere offered the expert testimony of Mr. Lunden. Mr. Lunden computed the lost profits for these two employees by taking a percentage of the total amount of lost profits that he had calculated. Because, as detailed above, this Court finds Mr. Lunden's calculation of the total to be so flawed as to deserve no weight, his calculation of the lost profits due to the breach of the restrictive hiring provision must be viewed similarly.

Datasphere, in its proposed findings of fact and conclusions of law, relies entirely on Mr. Lunden's testimony as proof of damages.  Because this Court has held that Mr. Lunden's estimate of damages will be given no weight, Datasphere has failed to show a reasonable basis for the calculation of the damages for either the breach of the right of first refusal or the breach of the restrictive hiring provision.  Because Datasphere has failed to prove an essential element of its breach of contract claim, judgment on the Sixth Count of the Complaint will be entered in favor of Defendant.

As an alternate holding, this Court, sitting as a court of equity, finds the Agreement void and unenforceable.  Equity demands that Doyle must not profit from his inequitable conduct, and that judgment on the breach of contract claim must be entered in favor of CHC.

The evidence at trial provides a compelling case for finding that it would be unjust to allow Robert Doyle to prevail on his breach of contract claim.  Doyle admitted that he intentionally concealed his ownership interest in Datasphere, and that no one at CHC knew about his ownership.[4]  Merchant's testimony is consistent with this.  The use of what Doyle termed a "constructive trust" is a transparent fiction and, for the purposes of this case, this Court views Doyle as having been the owner of his interest in Datasphere at all relevant times.  Doyle's concealment of his ownership was a scheme to deceive CHC.

---

[4] Stephen Gonosey testified that he had been aware while at CHC that Doyle was a principle in Datasphere, and that he had more than one conversation with Randall Verdino in which they discussed that Doyle had formed Datasphere.  Randall Verdino testified that he had never had any such conversation with Mr. Gonosey, and that Mr. Doyle had represented to him that Datasphere was Mr. Dodge's company.  Weighing this conflicting evidence about what CHC knew about Doyle's interest in Datasphere, this Court gives the most weight to Doyle's testimony, as it is an admission against his interest and therefore appears most credible, and it is consistent with Verdino's and Merchant's testimony.

The evidence does not paint a detailed picture of Doyle's specific role in negotiating the AT&T Agreement, but he at least participated in the negotiations. He also played an important role when he brought Datasphere to Verdino's attention and misrepresented that Datasphere was owned by Robert Dodge. Agiwal testified that Doyle negotiated the Agreement on behalf of CHC and, while Doyle testified to the contrary, this Court finds Agiwal's testimony more credible. There is also no dispute that, during the period in which the Agreement was negotiated and executed, Doyle was simultaneously working for CHC and involved in the management of Datasphere. Doyle did not execute the Agreement for either party.

It is undisputed that, at the time he filed the instant action, Doyle owned 100% of Datasphere.

This Court finds easily that it would be unjust to allow Doyle to enforce a contract, and to recover for breach of contract, when that contract was the fruit of his deceptive scheme. To do so would allow Doyle to profit from his inequitable conduct. If the operation of law here produced such an unjust result, this would be the precise condition for which the court of equity was designed.

One obstacle, however, in arriving at this result is that CHC has made technical errors in its pleadings. CHC pled various equitable affirmative defenses, including unclean hands, to Datasphere's breach of contract claim. Courts widely agree that equitable affirmative defenses cannot defeat a claim at law for breach of contract. The doctrine of unclean hands "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945). Thus, unclean hands is available

as an affirmative defense only against a party seeking to invoke the court's equitable powers.

See, e.g., Nomura Sec. Int'l, Inc. v. E*Trade Sec., Inc., 280 F. Supp. 2d 184, 196 (S.D.N.Y. 2003)

("unclean hands is an equitable defense and unavailable in an action seeking money damages.")

The Final Pretrial Order preserves for Datasphere only a claim for money damages, not for any

equitable relief.  (FPO 9, 13.)  This analysis applies as well to CHC's other equitable affirmative

defenses.

CHC's equitable affirmative defenses to this claim for money damages, then, cannot

provide the basis for the invocation of this Court's equitable powers.  This Court next looks to

CHC's counterclaims and third-party claims.  As discussed infra, the only such claim presently

before the Court is the tort claim for breach of fiduciary duty.  This is an action at law for tort

damages, not an action in equity.  The pleadings do not invoke the powers of a court of equity.

The Final Pretrial Order makes clear, however, that these are merely technical defects in

the pleadings, as the FPO states that one of Defendant's legal issues is whether "the AT&T

Agreement is void and unenforceable as a result of Robert Doyle's breach of fiduciary duty."

(FPO 27.)  Federal Rule of Civil Procedure 15(b)(2) states:

> When an issue not raised by the pleadings is tried by the parties' express or
> implied consent, it must be treated in all respects as if raised in the pleadings. A
> party may move — at any time, even after judgment — to amend the pleadings to
> conform them to the evidence and to raise an unpleaded issue. But failure to
> amend does not affect the result of the trial of that issue.

This Court determines that the parties tried by consent the issue of whether this Court should use

its powers as a court of equity to void the AT&T Agreement.  This provides a sufficient

foundation to invoke this Court's equitable powers to rescind the AT&T Agreement.  First Am.

Title Ins. Co. v. Lawson, 177 N.J. 125, 143 (2003) ("rescission [i]s an equitable remedy, which

properly depends on the totality of circumstances in a given case and resides within a court's discretion.")

As an alternate holding, then, based on the totality of the circumstances in this case, this Court exercises its discretion under New Jersey law to rescind the AT&T Agreement, and to declare it void and unenforceable.  Datasphere has failed to prove the existence of a valid contract, an essential element of its claim for breach of contract under New Jersey law. Defendant is not liable to Plaintiff for breach of contract.  Judgment on the Sixth Count of the Complaint will be entered in favor of Defendant.

### B.       Defendant's Counterclaims and Third-Party Claims

The Final Pretrial Order states that Defendant asserts three counterclaims:[5] 1) copyright infringement; 2) breach of contractual duties of confidentiality, against RDI and Robert Doyle; and 3) breach of fiduciary duty, not on a contract theory, against RDI and Robert Doyle.  (FPO 14-15.)  At the beginning of trial, CHC withdrew its copyright claim, and this Court dismissed the copyright claim with prejudice.  (3/23/2009 Tr. 5:4-10.)

In its post-trial brief, CHC makes no mention of the counterclaim for breach of contractual duties of confidentiality, and this Court infers that CHC has abandoned this counterclaim.  CHC's counterclaim for breach of contract will de dismissed with prejudice.

CHC's post-trial brief asserts only one counterclaim, for breach of fiduciary duty.  The Fourth Count of the Counterclaim and Third-Party Complaint in the Amended Answer states:

57.      Doyle acted as an agent in representing CHC as a Vice President in sales

---

[5] Only the copyright infringement claim is truly a counterclaim; the claims against Robert Doyle and RDI are not counterclaims, but third-party claims.  This error in terminology in the Final Pretrial Order is immaterial to the substantive rights of the parties, and is thus harmless.

efforts with CHC clients and in executing the MRA on CHC's behalf.

. . .

59.     In holding a secret ownership interest in Datasphere, while also entering
        into agreement(s) on CHC's behalf, all such transactions were affected by
        Doyle's conflict of interest as a fiduciary.

60.     As a result of Doyle's breaches of his fiduciary duty, CHC suffered
        damages.

The subheading of the Fourth Count states that the claim is asserted against Robert Doyle and

RDI.  The Final Pretrial Order, however, states that, as to the third-party claim for breach of

fiduciary duty, CHC intends to prove that it "is entitled to recover from Datasphere all sums paid

to it by CHC."  (FPO 13.)  The Final Pretrial Order "supersedes the pleadings."  Price v. Inland

Oil Co., 646 F.2d 90, 95 (3d Cir. 1981).  CHC's post-trial brief, however, seeks recovery from

Datasphere on a theory of aiding and abetting Doyle's breach of fiduciary duty.  This legal theory

is not pled in the Amended Answer nor referenced in the Final Pretrial Order.  The aiding and

abetting theory has not been preserved for trial.

        The parties do not dispute that claims for breach of fiduciary duty are decided under state

law.  As a threshold matter, then, this Court must determine which state's law applies.  In its

post-trial brief, Plaintiff contends that CHC engaged RDI under an agreement which contained a

provision stating that the agreement is governed by the laws of the state of New Jersey.  (Pl.'s

Post-Trial Br. ¶ 8(c)(v).)  Plaintiff also cites as controlling authority the New Jersey Supreme

Court case of Cameco v. Gedicke, 157 N.J. 504 (1999).  (Id. at ¶ 9(b).)  Defendant, in its post-

trial brief, contends that this Court "need not engage in a choice of law analysis because

regardless of whether the Court applies New York or New Jersey law the result is exactly the

same." (Def.'s Post-Trial Br. 17 n.4.)  This Court finds that the parties have effectively

consented to the application of New Jersey law to the claims for breach of fiduciary duty.

"Breach of fiduciary duty is a tort claim requiring a showing of duty, breach, injury, and

causation." In re ORFA Sec. Litig., 654 F. Supp. 1449, 1457 (D.N.J. 1987).  In its defense to

these claims, Datasphere points out the serious holes in CHC's theory and, indeed, the theory

appears to be more holes than cheese.  For the purposes of discussion, even if this Court were to

find that Doyle had a legal duty to CHC as a fiduciary, and that his disloyalty constituted a breach

of this duty, CHC has not shown causation of an injury, nor damages.  CHC does not even appear

to have a theory of causation and damage, much less proof.  This Court does not doubt that, on

the matter of loyalty to CHC, Doyle's conduct was reprehensible, but that is not what is at issue

here: the question here is whether the disloyalty was injurious, and this Court has heard no

evidence showing this to be the case.

This Court thus finds no evidence of damage to CHC caused by Doyle's breach, if any.

CHC argues that, nonetheless, Doyle and RDI should disgorge all compensation, pursuant to

Cameco.  Both parties cite Cameco as controlling authority.  Cameco, however, persuades this

Court that disgorgement is not an appropriate remedy in this case.  In Cameco, the New Jersey

Supreme Court considered the question of the appropriate remedy for an employee's breach of

the duty of loyalty, and concluded:

> In sum, various considerations affect determination of the breach of an employee's
> duty of loyalty and the appropriate remedy for a breach, including forfeiture of the
> employee's compensation. One consideration is the possible existence of
> contractual provisions. A provision might permit an employee to seek a second
> source of income, whether through a second job or an independent business.
> Conversely, a non-competition covenant might limit an employee's economic
> activities both during and after employment. A second consideration is whether

the employer knew of or agreed to its employee's secondary profit-seeking activities. An employee's disclosure of an intention to pursue a second source of income alerts the employer to potential problems and protects the employee from a charge of disloyalty. The third consideration concerns the status of the employee and his or her relationship to the employer. An officer, director, or key executive, for example, has a higher duty than an employee working on a production line. Fourth, the nature of the employee's second source of income and its effect on the employer are relevant. An employee's duty of loyalty to an employer generally precludes acts of direct competition. Employees should not engage in conduct that causes their employers to lose customers, sales, or potential sales. Nor should they take advantage of their employers by engaging in secret self-serving activities, such as accepting kickbacks from suppliers or usurping their employer's corporate opportunities. Employees who defraud their employers or engage in direct competition with them run the risk of discharge, forfeiture of the right to compensation, and other legal and equitable remedies. The extent to which the preceding considerations apply will vary from one case to another. Absent a governing contractual provision, the judicial task is to search for a fair and reasonable solution in light of the relevant considerations.

157 N.J. at 521-22.

Setting aside the issue of whether Doyle or RDI should be considered to have been employees of CHC for purposes of this analysis, none of the four Cameco factors weighs in favor of an award of disgorgement of compensation. First, CHC has not pointed to any provision in RDI's engagement agreement that materially relates to Doyle's involvement in the AT&T Agreement.[6] Second, there has been no showing that Doyle obtained profits at the expense of CHC.[7] Third, although Doyle held the title of Vice President, the evidence shows that this title was given to him to impress clients and generate business; there is no evidence that he held a key

---

[6] In its post-trial reply brief, CHC raises for the first time the argument that Doyle was subject to a non-compete provision in the relevant consulting agreement. (Def.'s Post-Trial Reply 16 n.3.) Even if true, this is irrelevant, since CHC does not allege that Doyle competed with CHC when he participated in the establishment of the AT&T Agreement.

[7] Rather, it is only in filing this action that Doyle appears to attempt to profit from his inequitable conduct. This Court agrees with CHC that Doyle should not be allowed to profit from his misconduct, but there has been no showing that he has yet made any profit from it.

position with CHC that might result in finding a higher level of fiduciary duty.[8]  Fourth, there is

no evidence that he engaged in any acts of competition, or that he engaged in any conduct that

caused CHC to lose sales or customers or profits, nor that Doyle received kickbacks or usurped

any of CHC's opportunities.  In short, not one of the circumstances that the New Jersey Supreme

Court found to give rise to a finding that disgorgement is an appropriate remedy has been shown

here.

In addition, disgorgement is not an appropriate remedy in this situation because the

payments at issue were made by CHC in exchange for services rendered, and there is no evidence

that the exchange was not fair.  CHC has neither alleged nor demonstrated that Doyle or

Datasphere did not provide the services for which payment was made.  Nor has CHC alleged that

the performance of either Doyle or Datasphere was inadequate, nor that the price charged was

unreasonable.  Rather, given that the parties have stipulated that, on April 1, 2003, Datasphere

consultants Ghosh and Johnson went to work for CHC on the AT&T project, this suggests that

Datasphere's services were not unsatisfactory.  (FPO 5.)  It is also undisputed that Datasphere

provided staffing for Phase I of the AT&T project, and that AT&T engaged CHC for Phase II.

This suggests that AT&T found Datasphere's performance during Phase I to be adequate.

Because this Court has no basis to conclude that CHC did not receive the services it paid for, it

would be unfair to require Doyle and Datasphere to disgorge the money earned for services

rendered.

Lastly, even if CHC had persuaded this Court that it is entitled to a remedy of

disgorgement of profits – which it has not done – this Court would be unable to ascertain the

---

[8] Datasphere itself asserts this in its post-trial reply brief.  (Pl.'s Post-Trial Reply 6.)

amount of the award.  The only evidence of the amount of compensation CHC paid RDI is Doyle's testimony that, during the period from February of 2002 through March of 2003, CHC paid RDI "something over $250,000."  (3/23/2009 Tr. 51:1-12.)  CHC asks for disgorgement of compensation received during the period of disloyalty, but presents no argument about what the period of disloyalty was.  This Court has no basis to determine the period of disloyalty and, thus, no way to ascertain what portion of the compensation should be disgorged.

Defendant's post-trial brief asserts a claim against Datasphere for aiding and abetting the breach of fiduciary duty.  As discussed above, although the Final Pretrial Order states that CHC sought recovery from Datasphere of sums paid to it, no claim for aiding and abetting a breach of fiduciary duty has been preserved for trial.  Furthermore, even if this Court were to try this claim against Datasphere on this theory, CHC states that one element that it must prove is that it suffered damage as a result of the breach.  (Def.'s Post-Trial Br. ¶ 7.)  As discussed above, it has failed to do so.  Nor has it made any demonstration that Datasphere made any profits to disgorge.  Judgment on CHC's counterclaim and third-party claim for breach of fiduciary duty will be entered in favor of Datasphere, Robert Doyle, and RDI.

Pursuant to FED. R. CIV. P. 52(a), the Court presents its findings of fact and conclusions of law.

## FINDINGS OF FACT

I.    The following undisputed facts were set forth in the Final Pretrial Order:

  1.    In or about late January 2002, Datasphere was formed by Robert Doyle, Vinod Agiwal, Imran Merchant, and Robert Dodge.  Each principal held a 25% ownership interest.

  2.    In March 2003, Doyle acquired the shares of Agiwal and Dodge in Datasphere,

and became the sole director and majority shareholder.

3.   On February 4, 2003, CHC and Datasphere entered into an agreement concerning CHC's long-term client, AT&T, which was executed by Dayananda Kamath and Imran Merchant respectively on behalf of CHC and Datasphere.

II.   Based on the evidence presented at trial, this Court now makes the following findings of fact:

1.   At the times that the AT&T Agreement was both negotiated and executed, Robert Doyle was a 25% owner of Datasphere.

2.   At the times that the AT&T Agreement was negotiated and executed, Robert Doyle worked as a consultant for CHC, pursuant to a consulting agreement between CHC and Doyle's company, RDI.

3.   Doyle brought Datasphere to Verdino's attention and misrepresented that Datasphere was owned by Robert Dodge.

4.   Robert Doyle participated in negotiating the AT&T Agreement on behalf of CHC.

5.   Robert Doyle engaged in a scheme to conceal from CHC his ownership interest in Datasphere.

6.   Robert Doyle's scheme to conceal accomplished its purpose, and Doyle intentionally concealed from CHC his ownership interest in Datasphere during the negotiation and execution of the AT&T Agreement.

7.   Doyle was the sole shareholder of Datasphere at the time Datasphere filed the Complaint that initiated the instant suit.

8.   At the time the AT&T Agreement was executed, no one at CHC knew about Doyle's ownership interest in Datasphere.

9.   Charles Lunden's expert testimony has substantial defects and will be given no weight.

10.  The number of man-hours of data management services that Datasphere would have provided CHC, pursuant to the AT&T Agreement, but for CHC's breach of the right of first refusal, could not be computed with reasonable accuracy. The profits lost by Datasphere because of CHC's breach of the right of first refusal

could not be computed with reasonable accuracy.

11.     The profits lost by Datasphere because of CHC's breach of the restrictive hiring covenant could not be computed with reasonable accuracy.

12.     CHC did not prove that any breach of fiduciary duty by Robert Doyle, or RDI, caused it damage.

13.     CHC did not prove that, by aiding or abetting of any breach of fiduciary duty by Robert Doyle or RDI, Datasphere caused it damage.

## CONCLUSIONS OF LAW

1.     This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1367.  This Court acquired jurisdiction over this case pursuant to 28 U.S.C. § 1331.  At the start of trial, CHC voluntarily dismissed its federal question counterclaims and this Court agreed to retain supplemental jurisdiction of the remaining claims in the action.

2.     The parties accept this Court's personal jurisdiction.

3.     The parties accept that venue lies in this district.

4.     CHC and Datasphere entered into a contract, the AT&T Agreement.  The governing law provision of the contract provides that it will be subject to and construed within the laws of the State of Ohio.

5.     At trial, the parties waived the application of the governing law provision in the AT&T Agreement and consented to the application of the law of the State of New Jersey.

6.     Because Datasphere's lost profits due to the breach of contract could not be computed with reasonable accuracy, Datasphere failed to prove damages, an essential element of its claim for breach of contract under New Jersey law. Defendant is not liable to Plaintiff for breach of contract.  Judgment on the Sixth Count of the Complaint will be entered in favor of Defendant.

7.     The parties tried by consent the issue of whether this Court should use its powers as a court of equity to find the AT&T Agreement to be void and unenforceable, and to rescind it.

8.     Doyle's concealment of his ownership interest in Datasphere, while working for CHC and participating in the negotiation of the AT&T Agreement, constitutes

26

inequitable conduct.

9.  As an alternate holding, because of Doyle's inequitable conduct, the AT&T Agreement is void and unenforceable, and is rescinded.  Datasphere failed to prove the existence of a valid contract, an essential element of its claim for breach of contract under New Jersey law.  Defendant is not liable to Plaintiff for breach of contract.  Judgment on the Sixth Count of the Complaint will be entered in favor of Defendant.

10. CHC's counterclaim for copyright infringement has been dismissed with prejudice.

11. CHC has abandoned its counterclaim and third-party claim for breach of duties of confidentiality; these claims are dismissed with prejudice.

12. CHC's counterclaim and third-party claim for breach of fiduciary duty are governed by the law of the State of New Jersey.

13. CHC has failed to prove, by a preponderance of the evidence, that it was damaged by any breach of fiduciary duty by Robert Doyle or RDI, an essential element of its third-party claim for breach of fiduciary duty under New Jersey law.

14. Using the analysis stated in Cameco v. Gedicke, 157 N.J. 504 (1999), CHC is not entitled to any disgorgement of compensation from Robert Doyle or RDI.  Neither Robert Doyle nor RDI has any liability to CHC for breach of fiduciary duty.  Judgment on CHC's third-party claims against Robert Doyle and RDI will be entered in favor of the third-party Defendants.

15. Because this Court has found that Robert Doyle and RDI did not breach any fiduciary duty to CHC, Datasphere cannot be liable for aiding and abetting such a breach of fiduciary duty under New Jersey law.  Datasphere is not liable to CHC for aiding and abetting a breach of fiduciary duty.  Judgment on CHC's counterclaim against Datasphere for aiding and abetting a breach of fiduciary duty will be entered in favor of Plaintiff.

An appropriate Order follows.


        s/ Stanley R. Chesler
STANLEY R. CHESLER, U.S.D.J.


Dated: July 13, 2009

27